## HALL *vs.* CHAFFEE & a.

In devises over of land after a preceding estate in fee, or of freehold, a *definite* failure of issue is when a precise time is fixed by the will for the failure of issue.

An *indefinite* failure of issue means the period when the issue or descendants of the first taker shall become extinct, whenever that shall happen, sooner or later.

It is the received doctrine of the courts, both in England and America, that where

Hall *v.* Chaffee.

a devise is made to A in fee, and if A should die without issue, then to B in fee, the limitation over to B by way of executory devise, is void for its remoteness, as it depends upon an indefinite failure of the issue of A; also that a devise to A in fee, and if A shall die without issue, then to B, gives to A an estate tail. Whether the doctrine is to be sustained in this State—*quære?*

If the limitation over be upon the death of the first taker without issue living at his death, it will be good as an executory devise, being a limitation upon a definite failure of issue.

In the construction of wills the court will be bound by the intention of the testator, to be gathered from the whole will, provided it be consistent with the rules of law.

Any words which certainly indicate an intention in the testator to confine the failure of issue to a dying without issue living at the death of the first taker, will be sufficient to rebut the construction of an indefinite failure of issue, even if the doctrine before referred to be admitted.

A testator devised land to his daughter in fee; provided, however, that if she should die without issue born alive of her body, to heir her estate, then she should have the use and occupancy of the premises during her natural life; but that after her decease the premises should revert back to his estate, and be equally divided between his two other daughters in fee.—*Held* that, admitting the doctrine, the words, *to heir her estate,* show that the testator meant the death of the first taker without issue living at the time of her death; that the same intention appeared also from the provision that she should have only an estate for life, in case of her death without issue, and that the limitation over to his other daughters was valid by way of executory devise, being to take effect upon a definite failure of issue.

Whether the words, *after her decease,* would in such case show that the testator meant that the limitation over should take effect upon the death of the first taker, without issue living at the time of her death, *quære?*

Executory and contingent interests are not assignable by deed at common law.

A person to whom an estate was limited by way of executory devise, having a vested right to a share of the same property, made a conveyance of all her "right, title and claim to the land," with a covenant against all claims arising under her, before the contingency happened.—*Held,* that after the executory devise became vested, she was not estopped by her covenant from claiming the land conveyed by it.

PETITION FOR PARTITION. The petitioner represented that she was the owner in fee of one undivided fourth part of about forty acres of a tract of land in Westmoreland, and that Chaffee, and Betsy Hall, the wife of *Camillus Hall,* were the owners of the residue of the tract, and she prayed that she might hold her share in severalty.

The parties agreed to the following statement of facts:

Hall *v.* Chaffee.

Seth Britton died seized in fee of the premises. By his will, which was approved on the 6th day of June, 1823, he made the following devise : " I give and devise to my daughter, Hannah Britton, alias Hannah Hall, (the petitioner,) wife of Seth Hall, and her heirs, one half of the remainder of my homestead farm in Westmoreland, being about twenty-seven acres of land, and to hold to her, the said Hannah Britton, alias Hannah Hall, and her heirs forever. I give and bequeath to my daughter, Huldah Britton, alias Huldah Chaffee, wife of Amasa Chaffee, and her heirs, half of the remainder of my homestead farm in Westmoreland, being about twenty-seven acres of land, to have and to hold to her, the said Huldah Britton, alias Huldah Chaffee, and her heirs forever ; provided, however, that if the said Huldah Chaffee should die without issue born alive of her body, to heir her estate, in that case it is my will and pleasure that she, the said Huldah Chaffee aforesaid, should have the use and occupancy of the premises aforesaid, during her natural life, but that after her decease the premises should revert back to my estate, and be equally divided between my daughters Hannah and Betsy, before mentioned, and their heirs, to have and to hold to them forever."

The premises in question are embraced in the above clauses. Betsy Hall is the daughter named in the above devise, and is the wife of Camillus Hall, and one of the defendants. Seth Hall, the husband of the petitioner Hannah Hall, is dead. Huldah Chaffee died without issue born alive, in the year 1839, at the age of 57 years. On the 26th day of April, 1824, Seth Hall and Hannah Hall, by their quitclaim deed, conveyed to Gaius Hall " all our right, title and claim to all the land or real estate willed to us by Seth Britton, late of Westmoreland, deceased, in said county of Cheshire and State of New-Hampshire, for description of said lands reference to said will being had will appear."

The deed contained a covenant of warranty against all claims arising under the grantors.

On the first day of April, 1828, Gaius Hall by his deed of quitclaim conveyed to the said Amasa Chaffee the same premises described in the deed from Seth Hall and wife to Gaius Hall.

If the petitioner is entitled to partition, judgment is to be rendered accordingly, otherwise judgment is to be rendered for the defendants.

*Chamberlain,* for the petitioner.

*Hubbard,* for the defendants.

GILCHRIST, J.   The first question for determination is, what estate did the petitioner take under the will of her father, Seth Britton ?   The answer to this question depends on the construction to be given to the will, and this must be determined by the application of the rules laid down for our guidance in similar or analogous cases.   The intention of the testator has been called the pole star for the direction of the court ; but what that intention is, it is often extremely difficult to discover.   Certain words and phrases, however, have received a settled construction when found in wills, and that construction it has been found necessary to adhere to, in order that the rules for the exposition of wills should be as certain as the nature of the case will permit.   And certain general rules are applied to the interpretation of wills, which are concisely expressed by Sir *R. P. Arden,* 4 *Vesey* 329.   " The intention is to be collected from the whole will taken together.   Every word is to have its effect, and is to be taken according to its natural and common import, and the court are bound to carry the will into effect, provided it is consistent with the rules of law."   But what intention the testator had in this case, it is impossible to say, unless we give to his language a certain legal effect, of which he was probably altogether ignorant, and thus declare the meaning of the will.   Few testators ever heard the expressions,

"executory devise" and "contingent remainder"; and those few, unless they were of the legal profession, could attach no definite idea to these technical terms.

Applying then to this will the settled rules of construction, if the limitation over to Hannah Hall is void by way of executory devise, as being too remote, she took no estate in the premises, *Fearne on Rem.* 444, (*note a,*) and Huldah Chaffee took an estate tail. If the limitation over to Mrs. Hall is valid, then Mrs. Chaffee took a fee simple, determinable on the contingency of her dying without issue living at the time of her death. The questions as to the estates of these two persons under the will, are so connected that the determination of one involves the other.

The will gives certain land to Mrs. Chaffee and her heirs, but "if she should die without issue born alive of her body, to heir her estate," then the land goes to Mrs. Hall and the testator's other daughter, Betsy.

The general question in this case is one which has been often mooted, and upon which the investigations have been not only very numerous but very profound, and they have sometimes also been embarrassed by extreme metaphysical and verbal subtleties. But enough light has been shed upon it by the numerous discussions it has received, to enable the courts at the present day to determine the cases without much difficulty, provided they are not extremely different from those that have preceded them. The cases in England, in an unbroken series until the time of Lord *Kenyon,* show, in the words of Ld. Ch. Jus. *Willes,* in *Brice* vs. *Smith, Willes R.* 1, "that if a man devise an estate to A and his heirs, and afterwards in his will gives his estate to another in case A dies without issue, these subsequent words reduce A's estate to an estate tail." Nor have the words, *in default of such issue,* ever been restricted to issue *living at the death of the first taker.* Ld. *Mansfield, Doe* vs. *Fonnereau, Dougl.* 487, 504, says, The cases are uniform that a devise in fee, with a remainder over if the devisee die without issue, or heirs of

the body, is a fee cut down to an estate tail, and the limitation over is void by way of executory devise, as being too remote, and founded on an indefinite failure of issue. In *Bigge* vs. *Bensley*, 1 *Bro. C. C.* 187, the words of the will were, "in case of the death of F. H. without issue" remainder over—and it was held that the remainder over was too remote. Lord *Thurlow* said there was not a single case which did not hold that such a limitation after these general words, was too remote, and that there were not less than fifty-seven cases upon the point. This was in 1783, and since that time the number is greatly increased. *Doe* vs. *Ellis*, 9 *East* 382 ; *Tenny* vs. *Agar*, 12 *East* 253 ; *Romilly* vs. *James*, 6 *Taunt.* 263 ; *Barlow* vs. *Salter*, 17 *Vesey* 479. The same view of the law has been taken by the courts in this country. *Ide* vs. *Ide*, 5 *Mass.* 500 ; *Paterson* vs. *Ellis*, 11 *Wend.* 259 ; 4 *Kent's Com.* 276, *and cases there cited.* Whether this construction accords with the general intention of testators, it seems now too late to inquire. Chancellor *Kent* thinks that by the use of the words, *dying without issue*, in a devise, testators generally intend an indefinite failure of issue. *Anderson* vs. *Jackson*, 16 *Johns.* 382. Probably no decision of any respectable tribunal can be found establishing a different doctrine. And perhaps we should find more difficulties in exploring a path hitherto untrodden, than in following in the route marked out for us by the general assent of the courts both in England and America.

Now a *definite* failure of issue is when a precise time is fixed by the will for the failure of issue, as in the case of a devise to A, but if he dies without lawful issue living at the time of his death. If there should be no such issue living at the time, a remainder over would be good. An *indefinite* failure of issue is a proposition the very converse of the other, and means a failure of issue whenever it shall happen, sooner or later, without any fixed, certain or definite period within which it must happen. It means the period when the issue or descendants of the first taker shall become extinct, and

when there is no longer any issue of the issue of the grantee, without reference to any particular time or any particular event; or, in the words of the statute, *de donis*, referring to the first taker, *if his issue shall fail.* An executory devise to take effect at such a remote period of time, is void; being against the policy of the law, which forbids property to be tied up and accumulate for a period which might extend through a great number of years and for many successive generations. *Thellusson* vs. *Woodford*, 4 *Vesey* 227.

Such is the law where there is nothing in the will to limit the generality of the words, *dying without issue*, and to show that the estate of the first taker is made determinable on a special contingency. But in the case of *Pells* vs. *Brown, Cro. Jac.* 590, which has been called the *magna charta* of this branch of the law, the testator devised lands to Thomas, his second son, in fee, and if Thomas died without issue, living William his brother, then William should have the lands in fee. It was held that the clause, *if he died without issue*, was not absolute and indefinite, when he died without issue, but it was with a contingency if he died without issue, *living William*, for he might survive William, or have issue alive at the time of his death, living William, in which case William should never have it, but was only to have it if Thomas died without issue, living William. This case has always been considered as law. But in *Porter* vs. *Bradley*, 3 *T. R.* 143, where the testator devised lands to A in fee, and if he should die *leaving no issue behind him*, then over, Lord *Kenyon* held that the limitation over was good by way of executory devise. He considered the case as settled by *Pells* vs. *Brown*, and that the words, *leaving no issue behind him*, necessarily imported that the testator meant, at the time of his son's death. And in *Roe* vs. *Jeffery*, 7 *T. R.* 589, where the testator devised lands in fee, and if the devisee should die *and leave no issue*, then over, Lord *Kenyon* held, on the authority again of *Pells* vs. *Brown*, that the limitation over was good, because the testator meant a failure of issue at the

death of the first taker. But these two cases have never been sustained by the courts in England. It has been denied by Lord *Eldon, Crooke* vs. *De Vandes,* 9 *Vesey* 197 ; Sir *W. Grant, Elton* vs. *Eason,* 19 *Vesey* 73 ; Lord *Abinger, Doe* vs. *Simpson,* 3 *Scott N. S.* 774, and in the very elaborate judgment of Lord *Denman* in *Doe* vs. *Ewart,* 7 *Ad. & El.* 636. Opposed to them are also the cases of *Tenny* vs. *Agar,* 12 *East* 253, and *Dansey* vs. *Griffiths,* 4 *M. & S.* 61.

In New-York, the case of *Fosdick* vs. *Cornell,* 1 *Johns.* 440, recognized the law of *Porter* vs. *Bradley* and *Roe* vs. *Jeffery,* and various decisions in accordance with them were made until the case of *Anderson* vs. *Jackson* arose, 16 *Johns.* 382. Chancellor *Kent,* in giving his opinion in that case in the court of errors, uses the following language, so worthy of his elevated character both as a man and a judge, in speaking of the case of *Fosdick* vs. *Cornell.* " I was at that time chief justice of the supreme court, and though I did not give the opinion, I will not shelter myself under that silence. I am free to say that I partook of its error. But I should be unworthy of public confidence, if, with more experience and more examination, having detected myself in an error, I should now be ashamed to confess it. I discovered years ago that *Fosdick* vs. *Cornell* was decided on mistaken grounds. The cases of *Porter* vs. *Bradley* and *Roe* vs. *Jeffery* were the blind guides that misled them." But notwithstanding the English decisions and the eminent authority of Chancellor *Kent,* the court of errors settled that Lord *Kenyon's* decisions were law, by a majority of four votes.

Reverting then to *Pells* vs. *Brown,* that case settled the doctrine which obtains at the present day, that any words which certainly indicate an intention in the testator to confine the failure of issue on which the estate is given over, to a dying without issue living at the death of the first taker, will be sufficient to rebut the construction of an indefinite failure of issue. In *Doe* vs. *Wetton,* 2 *B. & P.* 324, the de-

vise was to the testator's daughter in fee, but if she should happen to die leaving no child or children, lawful issue of her body, living at the time of her death, then over, and the limitation over was held good as an executory devise, as indeed it seems perfectly clear.

By this will it is provided, upon the death of Mrs. Chaffee without issue, as above stated, that *after her decease* the land should go to Hannah and Betsy. Now these words would seem to point with sufficient certainty to the death of Mrs. Chaffee as the time at which the failure of issue contemplated is to be ascertained. In *Doe* vs. *Frost*, 3 *B. & A.* 546, the testator devised to his son in fee, but if he should have no children, child or issue, the estate should *on his decease* become the property of the heir at law. Mr. Justice *Holroyd* founds his opinion that the limitation over was good, on the words, *at his decease,* and says that the will contemplates a failure of issue at the decease of the son ; and such seems to be the opinion of *Bayley,* J. ; but *Abbott,* Ld. Ch. J., does not allude to it. In *Robinson* vs. *Grey,* 9 *East* 1, the devise was to daughters for life, but if they should die without leaving issue, then, *after the decease* of the survivor of the daughters, in trust for the testator's grandson in fee. It was held that the limitation over was good, but to what extent the opinion of the court depended on the words, *after the decease,* does not appear, as it was a case sent from chancery, and the reasons of the court are not given. In *Walter* vs. *Drew,* 1 *Com.* 372, if the testator's son should die and leave no issue, *after the death* of the son, lands were devised over, and it was held that the son took an estate tail. In *Doe* vs. *Cooper,* 1 *East* 229, the devise was, " if the said R. C. shall die without leaving lawful issue, then and in such case after his decease," lands were limited over. It was held that R. C. took an estate tail. But this was for the purpose of effecting the general intent of the will ; and neither in this case nor in *Walter* vs. *Drew,* which may be regarded to some extent as authorities for holding that words

referring to the decease of the first taker are not restrictive, was the question of the force of these words presented to the notice of the court. Perhaps if there were no other expressions in the will from which the testator's intent could be clearly inferred, these words might be considered as sufficiently pointing out the specific time when the limitation over should take effect.

But, upon a careful examination of the will, we are of opinion that the testator meant to devise an interest in the land to Mrs. Hall, if Mrs. Chaffee should die without issue living at the time of her death. The contingency is the death of Mrs. Chaffee without issue born alive of her body *to heir her estate.* She must then die without issue living at the time of her death, for such issue only could "heir her estate." The testator intended that the estate should go to her and her issue first, and, failing them, should go to Hannah and Betsy. This is undoubtedly the common and ordinary idiom of .the language, independently of any technical construction, even with reference to the words, *dying without issue ;* but those words have received a settled meaning which cannot now be departed from. *Doe* vs. *Ewart,* 7 *Ad. & E.* 636. To *heir* an estate is a common expression. It means to take as heir, to inherit, and is so used by Dryden, as good an authority for English words as could be desired.

But we need not rely on this view of the will alone. That such was the intent of the testator appears also from the provision by which Mrs. Chaffee was to have only an estate for life. If she should die without issue, as above stated, then she is to have the use of the premises during her natural life, and after her decease they are to revert back to the estate, and be equally divided, &c. In a certain event, then, she was to have only a life estate. What that event was, the will states. It was her death without issue, &c. But whether she had any greater interest than an estate for life, could be determined only at the period of her death.

The testator then contemplated the existence of a certain state of things at her death, on the happening of which the petitioner, Mrs. Hall, was to take an estate. He meant to confine the failure of issue on which the estate was given over to Mrs. Hall, to Mrs. Chaffee's dying without issue living at the time of her death. The rule of law is then applicable, that the limitation to Mrs. Hall is good by way of executory devise.

Another question in the case arises from the deed by Mrs. Hall. It appears that on the 26th day of April, 1824, the petitioner and her husband, by their quitclaim deed, conveyed to Gaius Hall " all our right, title and claim to all the land or real estate willed to us by Seth Britton." The defendants have all the right and interest of Gaius Hall. Mrs. Chaffee died in the year 1839. The question is, whether the interest which Mrs. Hall took under the will, being by way of executory devise, could be transferred by such a conveyance ? A contingent remainder does not confer any interest which is grantable. *Shep. Touch.* 238. At common law, a possibility was held not to be assignable. 6 *Cruise, tit.* 39, *ch.* 20, *sec.* 47. Contingent executory interests or possibilities may be passed at law by fine, by way of estoppel. *Fearne on Rem.* 551. An assignment of a contingent interest in lands of inheritance may be carried into execution by a court of chancery, upon the ground that it is such a contract that its specific performance may be decreed. *Wright* vs. *Wright,* 1 *Vezey, sen.* 409. It may be transferred by deed in equity to a stranger. *Higden* vs. *Williamson,* 3 *P. Wms.* 132. A court of law, however, will not recognize the assignment of such interests before they vest in possession. 2 *Prest. Abstr.* 118. If A have a term for 1000 years, and devise it to B for life, remainder to C and his heirs, C may release his interest to B, although he cannot grant it over. 1 *Co.* 110, 114, *Albany's Case ;* 10 *Co.* 47, 51, 52, *Lampet's Case.*

But the deed of the petitioner contained a covenant of

warranty against all claims under the grantors, and the effect of this covenant remains to be considered. And here the case of *Blanchard* vs. *Brooks*, 12 *Pick*. 47, is in point. In that case, a person being the devisee of a contingent, and also of a vested remainder in lands, made a deed, with covenants of general warranty, and for quiet enjoyment, purporting to convey all his " undivided share or portion, right, title and interest of, in and to" the lands. Mr. Ch. Jus. *Shaw* says, " the grant in the deed is of all his right, title and interest in the land, and not of the land itself, or of any particular estate in the land. The warranty is of the premises, that is, of the estate granted, which was all his right, title and interest." " The grant in legal effect operated only to pass the vested interest, and not the contingent interest, and the warranty being coëxtensive with the grant, did not extend to the contingent interest, and of course did not operate upon it by way of estoppel." It was held that the plaintiff was not bound as a privy in estate with the grantor.

The opinion of the court is, that the petitioner is not estopped by her deed to claim the land.

PARKER, C. J. We are all agreed respecting the construction which is to be given to the will of Seth Britton, and in the judgment which is to be rendered in this case. There can be no question that the language of the will imports a definite failure of issue. The phraseology, that " if the said Huldah Chaffee should die without issue born alive of her body, *to heir her estate*, in that case it is my will and pleasure that *she should have the use and occupancy of the premises aforesaid during her natural life;* but that after her decease *the premises should revert back to my estate*, and be equally divided between my daughters Hannah and Betsy," &c. must satisfy the most devoted advocate for adherence to technical rules and technical meanings, not only that the testator intended a failure of issue at the time of the death of

Huldah Chaffee, but that the terms of the will do not reasonably admit of any other construction.

It is unnecessary, therefore, to decide what construction we should have given to this devise, if, instead of this phraseology, the will had simply contained a proviso, that if Huldah should *die without issue*, then the will of the testator was, that the estate given to her and her heirs should be equally divided between his daughters Hannah and Betsy, and their heirs.

But I am unwilling, by passing, without a remark, the authorities which have been cited on this subject, to leave it to be understood that I am prepared to follow them without hesitation, however numerous and uniform they may be. Neither do I desire to volunteer a dissent from such a very respectable array of decisions, in a case which does not require me so to do. I am quite willing to leave this matter to be settled in a case which shall require its decision ; saying, however, in the mean time, that I have strong doubts whether the decisions in England, which have been followed in various cases in this country, have any foundation which should commend them to our consideration as precedents for a decision in this State ; and suggesting some of the reasons which lead to those doubts.

I make no question as to the propriety or soundness of the distinction between a limitation over after a definite, and one after an indefinite, failure of issue, which admits the validity of the limitation in the first instance, and holds it to be too remote to be allowed, by the rules of law, in the other, because it would be too great a restraint upon alienation.

But the rule being, that there may be a limitation over by way of executory devise after a definite failure of issue, within certain limits, and a failure of issue on the death of the first devisee being a definite failure of issue within the rule ; the question is, what words shall, or shall not, be held to denote such a failure of issue.

There is no doubt that there are many decisions which

hold, or recognize, the rule, that the words, " in case of his dying without issue," " if he die without issue," or " before he have issue," " for want," or " in default of issue," applied to devises of this character, and without something super-added, are to be construed as meaning not a failure of the issue of the devisee at the time of his death, but a failure of his issue at any period, however remote. So of " leaving no issue," applied to real estate.

It may well be said of the decisions on this subject, that their name is legion. They are so many that their very number furnishes cause of suspicion that the rule is not quite sound. The number that existed in Lord Thurlow's time has probably been doubled, and perhaps trebled. I am re-joiced that my duty on this occasion does not require me to make a digest of them. It would seem, if the rule had a solid foundation, that one fifth, or one tenth, of the number might have settled the question. Its numerical strength, therefore, is weakness.

But my present purpose does not require a critical exam-ination of the origin of the rule, and of the reasons which have been offered in support of those decisions. In many of the later ones, the reason that the rule has been establish-ed, and become a rule of property, if not the sole reason, stands very prominent ; and if I believed that it had been generally so considered and understood in this State, and that a contrary ruling would shake titles to any extent, I should not hesitate to follow the precedents, for that reason alone. But so far from this, I very much doubt if ten cases (I had almost said one case,) can be found within the limits of the State, where the title is held under and in accordance with this rule ; and if there are any such, the chances are, perhaps, ten to one that the holding is in violation of the in-tentions of the testator under whose will the devisee has taken the estate.

I consider the question, therefore, fairly open to examina-tion and discussion here, upon its merits. When that dis-

cussion shall be had, there are several reasons against the adoption of the rule, which will deserve consideration along with those which may be urged in its favor.

1. The rule is in violation of the grammatical construction of the English language—of its ordinary idiom. In *Bigge* vs. *Bensley*, 1 *Brown C. R.* 190, Lord *Thurlow* is reported to have said, "I agree with you that the general sense of dying without issue, is at the time of the death. That is the grammatical construction, and is the sense, in general, of those who use the words." The Master of the Rolls, in *Donn* vs. *Penny*, 1 *Mer.* 22, says, referring to the words in the first clause of this sentence, that they seem to have been inaccurately reported. But they follow very well upon the position of the Attorney General, in the argument preceding them, that "dying without issue signifies without leaving issue." And what follows about the grammatical construction also serves to show that what precedes it is correctly stated.

Lord *Denman,* in *Doe* vs. *Ewart,* 7 *Ad. & Ellis* 636, expresses substantially the same opinion, where, speaking of the phraseology used in the will, "but in case it should happen that my said daughter Isabella depart this life without leaving issue lawfully begotten, then I give," &c., he says, "the words would, according to the common and ordinary idiom and construction of the English language, independent of any technical rules which have been applied to the construction of legal instruments, imply that the devise over was to take place in the event of Isabella dying without issue which should be living at the time of her death."

Several of the cases recognize the expression, "dying without issue," as having two senses, first a "vulgar sense," by which is not intended an ungrammatical or unauthorized sense, but a common or popular sense, as contrasted with the second, which is a legal or technical sense. 1 *P. Wms.* 432, *Target* vs. *Gaunt;* 10 *Mod.* 402, *S. C. ;* 1 *P. Wms.* 666, *Forth* vs. *Chapman.* See, also, 1 *P. Wms.* 199, *Nichols*

vs. *Hooper ; Ditto 565, Pinbury* vs. *Elkin ; 3 P. Wms.* 261. That this technical sense makes an unnatural and forced construction, is exceedingly clear. If any one die leaving issue, with what propriety can he be said to die without issue ? If the expression were, " if he shall die without property," or "die leaving no real estate," the meaning would be plain. That a different signification is possible where the negation is applied to issue, or heirs, by no means shows that such possible construction is a just one.

2. In thus violating the ordinary construction of the language, the rule gives to the will a different meaning and operation from that which the testator intended ; the first devisee taking a different estate from that which the testator designed, and being thereby enabled to defeat entirely his ulterior disposition. The rule is thus in conflict with another of the ordinary rules for construing wills, viz., that the intention of the testator is to govern.

That it must generally defeat the intention of the testator, is apparent from the fact that the technical sense is not the grammatical or idiomatic sense, or the vulgar sense, or common sense ; and that a great majority of wills are drawn by men not learned in this doctrine of a technical sense, by which devises in fee, with a limitation over upon a certain contingency, are converted into estates tail, with a contingent remainder ; and from the further fact that any learned scrivener, who, in pursuance of the intention of the testator, was designing to create an estate tail, such as the rule establishes, would not resort to the expedient of constructing a devise which could not take effect, according to its terms, consistently with the rules of law, in order to give a different estate, which he could readily describe by words aptly fitted to his purpose.

It is generally admitted that the rule defeats the intention. In some cases a doubt, or something stronger, has been expressed upon this point ; but the argument to show that testators generally, who use this language, have an idea of a

limitation over on an indefinite failure of issue, should one happen, one hundred or " even five hundred years after," (to use the language of one case,) will not bear examination.

There should be some very cogent reason for adopting a construction which not only defeats the intention of the testator, but does violence also to the language in which he has appropriately expressed that intention; when, according to the well settled rules of law, there is no difficulty in carrying the intention, thus appropriately expressed, into effect.

3. The adoption of the rule has caused distinctions to be made, without differences sufficient to commend them as precedents to be followed. If we adopt the rule as a matter of precedent, we must recognize some of these exceptions also ; although we shall not be bound to follow the course of conflicting decisions which have been made.

Thus, as a modification of the rule, the phrase, " leaving no issue," applied to real estate means an indefinite failure of issue, and applied to personal estate means a definite failure of issue ; and this when both are devised in the same sentence and by the same words. *Forth* vs. *Chapman*, 1 *P. Wms.* 663, 667 ; 3 *Atk.* 288, *Sheffield* vs. *Lord Orrery ;* 2 *Vez., sen.* 180, *Earl of Stafford* vs. *Buckley.* Lord *Kenyon* denied that the distinction was founded in law. 3 *D. & E.* 146 ; but he has been overruled.

The phrase, " leave no issue," was at one time held to import a definite failure of issue, in its application to real estate. After this was overruled, " leaving no issue behind him", was distinguished from the general rule. 3 *D. & E.* 143, 146, *Porter* vs. *Bradley.* This, again, has been questioned, if not overruled. An addition to the general words, " if the devisee shall die without issue," limiting the estate over " *after his decease*," has been held to furnish ground for a distinction, and to show that a definite failure of issue was intended. 1 *P. Wms.* 563, *Pinbury* vs. *Elkin ;* 1 *Com. R.* 372, *Walter* vs. *Drew.* This construction stands its ground with somewhat more of firmness, but it is quite apparent

that these words can add little if any thing to the construction. 19 *Ves.* 548, *Donn* vs. *Penny.* The limitation over is of course not to take effect before the death of the first taker ; and the words, *after his death,* may refer to an indefinite time after, if any technical rule require it, as well as the general words.

. A formidable objection to these last distinctions is, that the additional language is relied upon as indicating the intention of the testator to limit over upon a definite failure of issue, and thus give a character to the devise different from the operation of the general words ; when it is admitted that testators, generally at least, intend the self-same thing where there is no such addition. The words ' *leaving*' and ' *after,*' says Lord *Thurlow*, go far towards overturning the rule. 1 *Brown C. R.* 190.

The fact that the ulterior disposition is of a life estate only, has also been held to warrant or require a restricted construction. 3 *Atk.* 449, *Trafford* vs. *Boehm ;* 7 *D. & E.* 589, *Roe* vs. *Jeffery.* But this does not necessarily indicate an intention to refer to a definite failure of issue, if the general words are to be understood as denoting an indefinite failure. And the restrictive decisions have, therefore, been restricted. 17 *Ves.* 479, *Barlow* vs. *Salter.*

4. The reason for this technical construction, " That the interest of the heir is concerned, who is said to be always favored in our law," (7 *Ad. & Ellis* 636) is not applicable here.

The reason that a limitation over by way of executory devise is a restraint upon alienation, tying up the estate so that the first taker cannot dispose of it, if it have any force furnishes an objection against allowing any such devise, and not a reason for giving the language of testators a different meaning from what they designed.

The reason that if an estate tail be created, it may be barred, and the tenant acquire a right of alienation, and thus defeat the intention of the testator in making the devise

over, requires a greater necessity for alienation than actually exists to make it available.

The reason that if the limitation were construed to be on a definite failure of issue, the heir of the first taker might become entitled on his decease, and dying the day or an hour after, might thus defeat the intention of the testator, (1 *Har.&amp; Gill* 111, 126, *Newton* vs. *Griffith*,) assumes that the testator had an intention of directing the transmission of the estate for a longer time than his language imports. If the testator is content to leave the matter in that shape, the law may leave it there also.

These are some of the reasons which have been suggested at different times in justification of the rule.

5. Another objection to the adoption of the rule here, is, that it favors estates tail, which, although not abolished, are not in accordance with the general spirit of our laws. Such estates are hardly known among us, and this may certainly furnish some reason why we should not, against the will of the testator, so construe his will as to create one. The fact that the tenant may bar the entail by the fiction of a common recovery, only serves somewhat to lessen the force of this objection, but by no means obviates it.

6. The rule has never been satisfactory in England. This is abundantly shown by the multitude of cases, by the language of the judges from time to time, and by the distinctions adopted, already referred to.

It would seem that Lord *Kenyon* characterized *Pell* vs. *Brown*, Cro. Jac. 590, as the *magna charta* of this branch of the law, (see 3 *D. &amp; E.* 146,) because he was of opinion that it had rescued devises of this character from previous usurpation, and had established them, to some extent, on a basis which would sustain the intention of testators. "I shall not go further than I am obliged by the cases, in determining against what I think the meaning of the testator, which I am afraid I must do, or overturn the established rule." Lord *Thurlow*, 1 *Brown C. R.* 190.

Lord C. J. *Wilmot* said he would lay hold of the most trifling circumstance to give effect to the apparent intention of the testator. *Keily* vs. *Fowler*, cited in argument 7 *D. & E*. 591.

Mr. Fearne speaks of " the avidity of our courts to lay hold of any circumstances, however slight, to support these limitations of personal estates." *Fearne Con. R*. 483.

" A great deal of argument is necessary to convince me that in a case of realty those words" (" leaving no issue") " should be taken to mean an indefinite failure of issue. It would be very strange if these words had a different meaning when applied to real and personal property." Lord *Kenyon*, 3 *D. & E*. 146, *Porter* vs. *Bradley*.

" With regard to executory devises of terms for years, and other personal estates, the courts have for a very considerable time very much inclined to lay hold of any words in the will to tie up the generality of the expression, *dying without issue*, and confine it to dying without issue living at the time of the person's decease." * * * " Yet in the case of real estate it seems the construction is generally otherwise ; and the reason given is, that the interest of the heir is concerned, who is said to be always favored in our law." Lord *Denman*, 7 *A. & E*. 636, 648, 649, *Doe* vs. *Ewart*.

Although some of the latter cases relate to personal estate, they serve to show the feeling in relation to the construction of the general words. The cases in New-York exhibit, in a marked manner, the difficulties that have occurred from the adoption of the general rule and the attempt at making distinctions.

[On referring to the case *Keily* vs. *Fowler*, (*Wilmot's Notes of Opinions and Judgments* 298,) it will be found that the Chief Justice speaks in strong language of the rule in its application to leasehold and personal property. " No man," he says, " who reads this will could entertain a doubt what the testator meant by it, if it had rested only upon the words, 'if my daughter die without issue.' I speak now,

and mean to be understood as speaking, abstractedly from all the cases and legal exposition of these words, 'if she die without issue,' that is, if she has no issue at the time of her death ; if she leave no issue at the time of her death ; not, 'if she leave issue, and that issue fail two hundred years hence.'  Whenever that issue fails, the daughter will then become dead without issue, but she did not die without issue ; for, 'dying' denotes that '*punctum temporis*' when the breath departs out of the body."

" Such an exposition of these words as is contended for produces this monstrous absurdity ;—it makes dying ' with issue' and dying ' without issue,' to mean directly the same thing ; they will have exactly the same operation ; for if she dies with issue, the bequest over is not to take place ; and if she dies without issue, it is not to take place."

" It is a shameful abuse of language to say, that dying without issue on this day, the 1st of February, 1768, and being dead without issue upon the 1st of February, 1900, mean one and the same thing.  It is repealing that great law of all language, the grammar, and confounding present and future time together.  It is the most intolerable tyranny, the grossest barbarism, to say they mark one idea ; when the man who uses them, and all who read and hear them, are convinced they mark another."   p. 308.   * * * * *

" But, unfortunately for devisees claiming under bequests depending upon the contingency expressed in these words only, without any other words to restrict them, some of the greatest and ablest men have followed one another in saying that, alone and by themselves, they must be construed to mean, ' being dead without issue at any future time,' and that limitations over upon them are void."

" I cannot help shedding a tear upon the introduction of such a solecism into the law.  But I will relate how it happened : It was owing to a fundamental mistake originally, in transferring a construction which had been put upon these words, when applied to estates of inheritance, which might

be entailed, to leasehold and personal estates, which could not be entailed."

" I will shortly state the history of it : When estates of inheritance were devised to A, and if A died without issue, to B, the testator's intention was clear, that B was not to take whilst there was an issue of A. It was equally clear that he intended the issue of A should inherit his estate. It was equally clear, that the issue could take only by giving an estate tail to A, which would let in his issue ' *ad infinitum* ;' and therefore, to effectuate the intention, the judges construed these words to give an estate tail ' by implication,' and to have the same effect as if he had given the estate to A and his issue, which in a will gives an estate tail ; and no perpetuity could be created by such a construction, because the estate tail, and the remainders over upon it, might always be barred by a recovery. The words were thrown out of their natural signification, to comply with the intention." p. 309. * * * * *

" Then come cases where terms were given in the same words as would have given an estate tail by implication upon an inheritance, that is, to A, and, if he died without issue, to B. Having determined that these words would give an estate tail upon an inheritance, the judges gave them the same effect upon a leasehold estate, and followed it with all the consequences of an estate tail, in respect of the limitations over ; whereas, the very reasons which induced the judges to take the words out of their natural signification, totally failed when the words were applied to a leasehold estate. For the issue could not take a leasehold estate in a course of succession, as they might take an estate of inheritance ; and the danger of a perpetuity was avoided by leaving the words to operate in their natural signification, which would tie up the contingency to one life in being."

" Having forced the words out of their natural signification to effectuate the intention, they should have restored them to their natural signification again, when they found it

would not effectuate the intention, but entirely defeat it. Thus from giving these words the same operation when applied to leasehold estates as to estates of inheritance, hath arisen this technical rule, ' that the words, if he die without issue, shall mean being dead without issue at the remotest period of time ;' and consequently that a limitation over upon so remote a contingency is void."

"Lord Nottingham echoes this rule over and over again, in the Duke of Norfolk's case. (*Select Cases in Chancery* 26.) Lord Macclesfield, Lord King, Lord Talbot and Lord Hardwicke have followed one another in saying the same thing ; and we do not mean to shake that rule, because ' *stare decisis*' is a first principle in the administration of justice ; and this, not from any fear of bringing appeals or writs of error in particular cases : time guards them :—but because these cases have furnished the light by which conveyancers have been directed in settling and transferring property from one man to another. Upon the faith of an established rule, and the acquiescence of judges and of the whole nation in it, property to the amount of millions may depend. The judges now (as their predecessors have always done) bow down to the rule, ' *pro salute populi*,' which is the supreme law of every community. But this rule doth so revolt against the human understanding, that all the chancellors who have agreed to the rule, at the same time have said that if there are any words, passages, or expressions in a will to show that the testator did not mean to use the words in the ' legal' but the ' vulgar' sense ; that intention manifested should repel the presumption of their being used in their ' artificial and technical' sense, and shall leave the words to reässume their natural shape, and act in their proper character." p. 311. * * * * *

" The truth is, these words are condemned by the law to be surly, rigid, inflexible and immovable, when they are alone ; but if they can but once be got into sensible company, they lose their gloomy, dogmatical, arbitrary disposition,

and both speak and act as the rest of the company do." p. 321.

Now upon the origin and history of the rule, as thus stated by Chief Justice Wilmot, it may be sufficient, for the present, to say, that if, as anciently applied to estates of inheritance, when the devise was to A, and if A died without issue, to B, the testator's intention was clear that the issue of A should inherit his estate, (about which there may be doubts ;) and if this could only be done by giving an estate tail to A, which would let in his issue ' *ad infinitum*' ; it is equally clear that here, where a devise is made " to A and his heirs," generally, and if he die without issue, " to B and his heirs," the intention is not to give an estate which shall go to the issue " *ad infinitum*," unless barred by a recovery, but to give a fee simple conditional, with a limitation over in the event that the devisee has no issue living at his decease. Entails being obsolete here, there can, ordinarily, with us, be no difference of intention between real and personal estate, in the use of such general words. No man can fairly be presumed to intend to create an estate tail, by the use of them, in relation to estates of inheritance, in a community where estates tail are so very rarely created.

The rule, therefore, will not effectuate the intention of testators here, even in its application to such estates ; more especially if the limitation over is to be defeated, even when the first taker dies leaving no issue at his death.

Since the introduction and establishment of executory devises, there is no reason to throw the words out of their natural signification, to comply with the intention ; and they may cast off the gloomy, dogmatical, arbitrary disposition, to which they have been condemned, and speak and act sensibly, as they do in other cases, without being required to get into other company to enable them so to do.

A case in South Carolina shows that the construction, even in relation to estates of inheritance, does not prevail under all circumstances. A testator there devised to his son Ben-

jamin the island called Callewashie, with the slaves, stock, &c. thereon; but in case he died without issue, then he gave it to his grandson D. H. and his heirs forever.   The court (Chancellors *Rutledge* and *Marshall*,) said, " There is no doubt if the statute of entails was of force in this State but that Benjamin would have had an estate tail in the land; for it is laid down clearly in the books, that if lands are devised to one, and if he die before, or without issue, or not leaving issue, it is devised over, these limitations create an estate tail; but that statute not being of force, the estate he took was a fee conditional at common law—the reversion of the estate still remaining in the testator, which he had a right to dispose of, and which he has done in this clause, to his grandson Daniel and his heirs." 2 *Desaussure Rep*. 94, 112, *Cruger* vs. *Heyward*.   May not the practical abolition of entails here be as significant for the purpose of construction?]

If these considerations have any weight to show that we are not required to recognize the rule here, their force will not be lessened by the fact that the rule, having been established in England by this host of decisions, was so repugnant to the sound sense of the nation that it has been altered by act of parliament, even in relation to estates of inheritance. 1 *Vict., ch.* 26, § 29.   There is, as yet, no recognition of it which has expressly incorporated it into our jurisprudence as a rule of property.   And there is some significance to the question whether we are bound to follow a cast-off rule of the English jurisprudence, as a true exposition of the common law here, unless there is some better reason for it than can be derived from the consideration that it violates the grammatical construction and idiom of the language, and at the same time gives to words a meaning different from that ordinarily attached to them; thus almost invariably defeating the intention of the testator, leading to distinctions where differences ought not to exist, and to the creation of estates which are practically almost unknown among us.   It

comes to a question whether it is necessary, under such circumstances, to follow the decisions elsewhere.

But I desire to leave the matter for future discussion.

Upon the question respecting the construction and effect of the deed of Seth and Hannah Hall, I do not wish to add any thing to what has been said by my brother Gilchrist.

WOODS, J., concurred in the views expressed by the Chief Justice.

*Judgment for partition.*